# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————

## No. 201500296

———————————

## UNITED STATES OF AMERICA
Appellee

v.

## JASON J. WILLIAMS
Sergeant (E-5), U.S. Marine Corps
Appellant

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Colonel James K. Carberry, USMC.
Convening Authority: Commanding General, 1st Marine Aircraft Wing, Okinawa, Japan.
Staff Judge Advocate's Recommendation: Lieutenant Colonel Christopher W. Pehrson, USMC.
For Appellant: David P. Sheldon, Esq.; Lieutenant R. Andrew Austria, JAGC, USN.
For Appellee: Major Cory A. Carver, USMC; Lieutenant Jetti L. Gibson, JAGC, USN; Lieutenant Taurean K. Brown, JAGC, USN.

———————————

Decided 17 March 2017

———————————

Before GLASER-ALLEN, CAMPBELL, and HUTCHISON, *Appellate Military Judges*

———————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————

CAMPBELL, Senior Judge:

At a contested general court-martial, officer and enlisted members convicted the appellant of conspiring to commit sexual assault, violating a lawful general order, wrongfully photographing the private area of another

person, adultery, and fraternization—violations of Articles 81, 92, 120c, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 892, 920c, and 934 (2012).[1] The convening authority approved the appellant's adjudged sentence of three years' confinement, reduction to pay grade E-1, and a bad-conduct discharge.

The appellant raises four original assignments of error (AOEs), which we renumber as follows:  (1) there is legally and factually insufficient evidence for his conspiracy, indecent recording, and fraternization convictions; (2) his sentence was inappropriately severe compared to his co-accused's sentence; (3) the military judge erred in failing to award confinement credit for restriction tantamount to confinement,[2] and (4) adultery under the UCMJ unconstitutionally imposes criminal liability and punishment for only heterosexual service members. In a supplemental AOE, the appellant further argues the military judge erred in the findings instructions to the court-martial members regarding reasonable doubt.[3] Having considered each AOE, we set aside the fraternization conviction and affirm the remaining findings and a reassessed sentence, as reflected in the decretal paragraph. With that corrective action, no error materially prejudicial to the appellant's substantial rights remains. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

During August 2014, the appellant and two friends, Lance Corporal (LCpl) Gardner and Corporal (Cpl) Handoo, were stationed in Hawaii. As the three men drove towards Chinatown one Saturday night in Honolulu, the appellant stopped to offer a ride to two female college freshmen—H.I. and

---

[1] The members acquitted the appellant of a charge and three specifications alleging he violated Article 120, UCMJ, by having vaginal and anal sex with R.W. while she was incapable of consenting due to impairment by alcohol, and causing bodily harm in penetrating her mouth with his penis. The military judge also granted the appellant's motion for a finding of not guilty, under RULE FOR COURTS-MARTIAL 917, MANUAL FOR COURTS-MARTIAL UNITED STATES, (2012 ed.), for a specification alleging the appellant violated Article 81, UCMJ, by conspiring with Lance Corporal Gardner to sexually assault H.I.

[2] The third AOE is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] We summarily reject the third, fourth, and supplemental AOEs. *United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992). We note the fourth AOE was resolved, contrary to the appellant's position, in *United States v. Hackler*, 75 M.J. 648, 656-57 (N-M. Ct. Crim. App. 2016), and the supplemental AOE was resolved, contrary to the appellant's position, in *United States v. McClour*, 76 M.J. 23 (C.A.A.F. 2017) and *United States v. Rendon*, 75 M.J. 908, 916-17 (N-M. Ct. Crim. App. 1 Nov. 2016), *rev. denied*, __ M.J. __(C.A.A.F. Feb. 14, 2017).

R.W.—walking in search of a bus stop, and obviously unfamiliar with the area.[4] The 18-year-olds explained they had been on the island for only a few days preparing for their school year to begin. Before the men left the students at an 18-and-over club, H.I. and LCpl Gardner exchanged phone numbers in case the young women later needed a ride. Unable to purchase alcohol at the club, H.I. eventually sent a text message to LCpl Gardner about possibly drinking together, as a group, elsewhere. The appellant and LCpl Gardner picked up H.I. and R.W. and provided them vodka and whisky, without mixers or chasers, for the next several hours. During that time, the two men drove them around town, took them to a strip club, and stopped briefly at LCpl Gardner's on-base house, before they all finally retrieved Cpl Handoo from the bar where he had remained without the appellant and LCpl Gardner until it closed.

Between leaving the strip club and entering LCpl Gardner's house for more alcohol (since all the package stores had closed), LCpl Gardner and H.I. kissed outside of the vehicle and during the ride to base housing. While at LCpl Gardner's home, the appellant kissed R.W. Cpl Handoo testified that during the 15 to 20 minutes that he rode in the car after the group came back for him, R.W. and the appellant were next to him in the back seat, "talking[,] and then she had her arm around him and he had his arm around her. They were making out in between."[5]

During the ride to pick up Cpl Handoo, H.I. "felt very fatigued and like [she] just wanted to sleep because [her] eyes felt very heavy."[6] Although she remained in the front passenger seat while LCpl Gardner next drove everyone to a hotel, H.I. turned and kissed Cpl Handoo, who was sitting in the back seat. This bothered LCpl Gardner. H.I. testified that LCpl Gardner "didn't want [her] to" kiss Cpl Handoo, and that he said she "couldn't kiss both of them."[7]

As LCpl Gardner was inside the hotel getting a room with two beds, H.I. complained about "feeling very sick" and "wanting to throw up" before getting out of the car and vomiting.[8] While R.W. assisted H.I., the appellant told Cpl Handoo to "stay away from [H.I.] because [LCpl Gardner] had put in some

---

[4] Sets of alias initials identify the college students throughout this opinion.

[5] Record at 146.

[6] *Id.* at 242.

[7] *Id.* at 243.

[8] *Id.* at 147, 244. H.I. had only consumed alcohol twice in her life, and she drank hard alcohol for the first time that evening. *Id.* at 235.

work earlier that night" and "should get to be with [her.]"[9] When LCpl Gardner returned for the group, he attempted to guide H.I., and then had to carry her, "like you hold a baby," in his arms to the hotel room.[10]

LCpl Gardner took H.I. to the bed farthest from the entrance, while the appellant and R.W. got into the bed closest to the entrance, and LCpl Handoo got onto the couch. After a brief conversation, the hotel room lights were turned off. With the exception of the bathroom light being on while R.W. and the appellant were there with the door closed, all of the hotel room lights remained off throughout the rest of the night.

R.W. testified that her memories of the events after the group left LCpl Gardner's house were difficult to order chronologically. She "remember[ed] being on the [hotel] bed and . . . the sensation of someone having [vaginal] sex with [her]."[11] Shortly after entering the room, and as he played games on his phone, Cpl Handoo heard the appellant and R.W. having sex in the bed next to his couch.

When the appellant and R.W. stopped having sex, they got up and went to the kitchen to drink water. Cpl Handoo took the opportunity to get some water, as well. Once R.W. returned to bed, the appellant and Cpl Handoo remained in the kitchen area. The appellant said Cpl Handoo "could have a go with her if [he] wanted[,] too," but Cpl Handoo refused the offer to have sex with R.W by saying he "was not interested."[12] The appellant asked Cpl Handoo "if it was because [he] didn't have any condoms or anything[.]"[13] Feeling "uncomfortable and mad" about the conversation, Cpl Handoo replied "no" and explained that he "did not need any [condoms]."[14] He then put on his shoes and left the hotel.

LCpl Gardner testified that shortly after he saw R.W. and the appellant under the sheets, engaging in what he thought was sexual intercourse, he saw R.W. vomit in the sink and then go into the bathroom with the appellant. While she could not recall whether she vomited before or after sex with the appellant, R.W. remembered vomiting in the bathroom, and that the appellant joined her there and received oral sex until R.W. tasted semen in her mouth.

---

[9] *Id.* at 150.

[10] *Id.* at 148.

[11] *Id.* at 192-93.

[12] *Id.* at 155, 158.

[13] *Id.* at 155.

[14] *Id.*

While H.I. remained in the bed with LCpl Gardner, she recalled looking over for her friend and seeing R.W. and the appellant in the other bed. She then saw LCpl Gardner and the appellant switch beds as they spoke to each other—but she could not hear their actual exchange.

At trial, LCpl Gardner explained that he and Cpl Handoo had a brief "standoff" after Cpl Handoo's conversation with the appellant, and Cpl Handoo told him "[t]his isn't right" before putting on shoes and walking out of the room.[15] He and the appellant then had "a conversation" in which they "tr[ied] to figure out why [Cpl Handoo] left and where" he went based on concerns that Cpl Handoo "gets out of control" when drunk.[16] As LCpl Gardner sat next to the appellant on the edge of the bed that R.W. lay on, fully clothed, R.W. "grabbed [LCpl Gardner], pulled [him] down, and started kissing on [him]."[17] The appellant told LCpl Gardner, "just don't kiss her in the mouth."[18] Although a sheet covered the bottom half of LCpl Gardner's and R.W.'s bodies after the men switched beds, H.I. twice heard R.W. say "it hurts," and she assumed from the noises that LCpl Gardner and R.W. were having sex.[19] LCpl Gardner testified that he and R.W. had sex for five to ten minutes, until "[s]he started to—in [his] view of her—fall asleep."[20]

H.I. also recalled awaking and "pretending to sleep because [she] wasn't sure what was going on" or "what [the appellant and LCpl Gardner] were going to do next."[21] She watched, despite LCpl Gardner's attempts to shield her eyes, the appellant "taking pictures of [R.W.] without her skirt and underwear on."[22] She recalled that "there was a flash and . . . [she] could hear the clicking of the camera sounds" as R.W. "was just laid out on the bed unconscious."[23] She was confident that R.W. was unclothed "because [she] saw later on that" the appellant and LCpl Gardner put R.W.'s "skirt and underwear" back on R.W.'s body.[24]

---

[15] *Id.* at 354.

[16] *Id.*

[17] *Id.* at 355.

[18] *Id.* at 356.

[19] *Id.* at 248.

[20] *Id.* at 359.

[21] *Id.* at 250.

[22] *Id.*

[23] *Id.* at 251.

[24] *Id.*

LCpl Gardner described the photograph incident as occurring after he had sex with R.W., and then returned from washing his hands. First, he briefly spoke with H.I. until she, too, fell back asleep on the other bed. He then "put a hat over [H.I.'s] eyes so that she wouldn't wake up" from "the light on . . . [the appellant's] phone."[25] From the light of the appellant taking a picture, LCpl Gardner saw R.W. "was just laying there" in bed without any covers.[26] However, LCpl Gardner denied that R.W. was naked during their sexual intercourse, denied that R.W. was naked at the time that the appellant took the photograph, and denied that he had ever told criminal investigators that R.W. was ever naked in the hotel room. According to LCpl Gardner's testimony, after taking the photograph, the appellant "said he didn't like the picture . . . [t]hen he deleted it[.]"[27]

LCpl Gardner also testified that the appellant was his closest friend on the island of Oahu, and that the two never refer to each other by rank when not in uniform. Beyond their extensive socializing together, the appellant, for months, actually lived in LCpl Gardner's on-base home, after the appellant's family had returned to the continental United States.

Following the appellant's contested trial, LCpl Gardner pleaded guilty to sexually assaulting H.I. and R.W. He was sentenced to 26 months' confinement, reduction to pay grade E-1, and a dishonorable discharge. Pursuant to a pretrial agreement, the convening authority approved only 24 months' confinement along with the adjudged reduction and discharge.[28]

## II. DISCUSSION

### A. Legal and factual sufficiency

The appellant contends the prosecution offered legally and factually insufficient evidence for three of his convictions. We agree, in part.

We review each case *de novo* for legal and factual sufficiency. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is whether, considering the evidence admitted at trial in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.

---

[25] *Id.* at 361.

[26] *Id.* at 362-63.

[27] *Id.* at 371.

[28] Defense Counsels 28 Jul 2015 submission of Legal Errors and Clemency Request at 4. Both LCpl Gardner and Cpl Handoo testified under grants of testimonial immunity. Cpl Handoo received leniency in the form of regimental nonjudicial punishment instead of a trial by court-martial for his offenses.

*United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of the accused's guilt beyond a reasonable doubt." *Id.* at 325. We may "judge the credibility of witnesses, and determine controverted questions of fact," and substitute our judgment for that of the fact finder. Art 66(c), UCMJ; *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990).

### 1. Conspiracy

First, the appellant argues "the Government failed to present evidence that [he] and LCpl Gardner entered into an agreement to sexually assault R.W.," or "sufficient evidence that LCpl Gardner's penetration of R.[W].'s vagina was an overt act to effect the conspiracy."[29] The elements of this offense are: (1) that the appellant entered into an agreement with LCpl Gardner to sexually assault R.W.; and (2) that while the agreement continued to exist, and while the appellant remained a party to the agreement, LCpl Gardner performed the overt act of inserting his penis into R.W.'s vagina without her permission, for the purpose of sexually assaulting her. MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2012 ed.), Part IV, ¶ 5(b).

A conspiracy "'need not be in any particular form or manifested in any formal words,' [and] '[i]t is sufficient if the agreement is merely a mutual understanding among the parties.'" *United States v. Harman*, 68 M.J. 325, 327 (C.A.A.F. 2010) (quoting *United States v. Mack*, 65 M.J. 108, 114 (C.A.A.F. 2007) (second alteration in original). "'The existence of a conspiracy may be established by circumstantial evidence, including reasonable inferences derived from the conduct of the parties themselves.'" *Id.* (quoting *Mack*, 65 M.J. at 114).

The trial evidence shows the appellant and LCpl Gardner agreed to allow LCpl Gardner to sexually assault R.W. after she already had sex with the appellant and vomited in the hotel room. At that point, R.W. was too intoxicated to consent to further sex, or even realize with whom she was having sex. The appellant first offered Cpl Handoo an opportunity to "have a go with her."[30] When Cpl Handoo left because of that offer, and a strong belief that the unfolding circumstances were not right, the appellant and LCpl Gardner then spoke about why Cpl Handoo left. Like Cpl Handoo's earlier kissing session with H.I. in the car, by then LCpl Gardner's own efforts to

---

[29] Appellant's Brief of 15 Jan 2016 at 8-9.

[30] Record at 155.

escalate physical interaction with H.I. had been thwarted.[31] LCpl Gardner's physical encounter with R.W. began only after his conversation with the appellant as LCpl Gardner sat on R.W.'s bed, just beside the appellant. That the appellant did not stop R.W. and LCpl Gardner from kissing further demonstrates the formation and continuation of an ongoing conspiracy.[32] The appellant's only warning for LCpl Gardner—"just don't kiss her in the mouth"—directly encouraged LCpl Gardner to sexually assault R.W.[33]

There is overwhelming evidence that LCpl Gardner had sex with R.W. As to consent, LCpl Gardner confessed that he had vaginal intercourse with R.W. just after the appellant had sex with her, and after seeing her vomit from drinking too much hard alcohol. The collective testimony of LCpl Gardner, R.W., and H.I. thus proves that R.W. was, through impairment by alcohol, not capable of consenting to sex with LCpl Gardner.

H.I.'s credible testimony regarding this offense supports both of its elements. She witnessed R.W. become highly intoxicated. She saw the appellant and LCpl Gardner switch beds, allowing LCpl Gardner to take the appellant's place next to R.W. She listened to the appellant and LCpl Gardner speaking to each other, before she heard LCpl Gardner having sex with R.W., followed by R.W. complaining, "it hurts, it hurts."[34]

The next day, R.W. exchanged text messages with the appellant. Their discussion covered both R.W.'s and H.I.'s concerns about what might have happened in the hotel room:

> R.W.: "I'm a little unclear about what happened last night, did I hookup with anyone?"
> Appellant: "You have no worries. Call me if you need clarity."
> You were a good girl[.]

---

[31] As the appellant and R.W. had sex relatively soon after the group entered the hotel room (and before R.W. became obviously ill), in the other bed, H.I. had refused to have sex with LCpl Gardner. She physically resisted his advances and explained her strongly held religious beliefs about maintaining her virginity until marriage.

[32] *Id.* at 355-56. *See Harman*, 68 M.J. at 327 (finding a conspiracy conviction legally sufficient, in part, because the appellant's "failure to stop or report the [prisoner] abuse . . . support[ed] a reasonable inference of conspiracy derived from the conduct of the parties themselves") (citation and internal quotation marks omitted)).

[33] *Id.* at 356. *See Harman*, 68 M.J. at 327 (also finding the conspiracy conviction legally sufficient, in part, because Harman's "smiling face, when seen with the 'thumbs up' hand signals, show[ed] approval and encouragement to her co-conspirators" and thus justified an inference that "she [had] join[ed] their [criminal] purpose") (citation and internal quotation marks omitted).

[34] *Id.* at 248-49.

R.W.: It's kind of expensive to call since I have a [foreign] phone plan. [C]an you just tell me through text?"
Appellant: "Nothing happened[.] Why is your friend so upset [referring to text message discussions between H.I. and LCpl Gardner]?"

R.W.: "Please be honest, I vaguely remember something happening[.] She feels guilty because she's really religious."
Appellant: "What do you recall[?] What did she do to be guilty?

R.W.: "Having sex with someone. I don't think she did anything, but she can't remember[.]"
Appellant: "She didn't[.]"

R.W.: "I guess I did though[.] It's okay, I just want to know exactly what happened[.] I don't like not remembering[.]"
Appellant: "It was [sic] a lot of drinking. I hate not remembering everything also."

R.W.: "Did I have sex with you or [LCpl Gardner] or both? I just want to know[.] Can you please tell me[?]"
Appellant: "Going to a party now. We can come get you do [sic] we can talk[.]"

R.W.: "No I don't need to see you in person, I just need a straight up answer, please have enough respect to give me that at least[.]"
Appellant: "What do you remember?"

R.W.: "I already told you what I remember, all I want to know is who I did stuff with[.] Please just tell me[.]"[35]

The appellant did not text R.W. again that day. He sent a single text message on two subsequent days—respectively, "How you been?" and "You alright?"[36]

A reasonable factfinder could have found a mutual understanding legally sufficient to support the conspiracy conviction, from the appellant actively encouraging LCpl Gardner to have sex with R.W., immediately before LCpl Gardner inserted his penis into R.W.'s vagina without her permission and

---

[35] Prosecution Exhibit 2 at 1-2.

[36] *Id*. at 2.

while she was incapable of consenting, in order to sexually assault her. The appellant's refusal to answer R.W.'s questions about who had sex with her demonstrates consciousness of guilt. Weighing all the evidence, and making allowances for not having observed the witnesses, we are convinced beyond a reasonable doubt that the conspiracy conviction is factually sufficient.

*2. Indecent recording*

Next, the appellant avers there was no "evidence that an indecent picture was ever taken" since the prosecution "presented no such picture . . . no witness indicated seeing such a picture," and "LCpl Gardner testified that when he saw [the appellant's] phone flash, R.[W]. was fully dressed."[37] The elements of this offense are: (1) that the appellant knowingly photographed R.W.'s private area without her consent, (2) under circumstances in which R.W. had a reasonable expectation of privacy. MCM, Part IV, ¶ 45c.a(a)(2). "The term 'private area' means the naked or underwear-clad genitalia, anus, buttocks, or female areola or nipple." *Id.* at (c)(2).

Although no indecent photograph of R.W. was in evidence, the members were allowed to find that the appellant had photographed R.W.'s private area based on the circumstantial evidence. RULE FOR COURTS-MARTIAL (R.C.M.) 918(c), MCM; *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004) ("It is well accepted that circumstantial evidence is sufficient to sustain a finding of guilt."); *see, e.g. United States v. Reed*, 51 M.J. 559, 560-61, 563-64 (N-M. Ct. Crim. App. 1999) (affirming Reed's conviction for larceny of a modem where the box containing the modem was in Reed's office, the box was found empty, Reed later "lent" a similar if not identical modem to the office, and Reed made "false official statements" indicating "consciousness of guilt"), *aff'd*, 54 M.J. 37 (C.A.A.F. 2000); *United States v. Flesher*, 37 C.M.R. 669, 671-75 (A.B.R. 1967) (affirming Flesher's conviction for sodomy of his step-daughter based on a photograph of a physically similar but faceless man engaged in that act with the victim, Flesher owning a camera that had a timer, the dates of the photographs matching the dates of Flesher's enlistment, and similarities between Flesher's dwelling and the room in the photograph).

Contrary to the appellant's assertion, both LCpl Gardner and H.I. testified to seeing and hearing the appellant photograph R.W. while she was unaware of being photographed. LCpl Gardner thought R.W. was "sleeping" at the time.[38] H.I. described R.W. as "not conscious."[39] H.I. further testified

---

[37] Appellant's Brief at 9.

[38] Record at 366.

[39] *Id.* at 251.

that R.W. could not have been wearing a skirt or underwear in the photograph, "because [H.I.] saw later on" the appellant and LCpl Gardner dress R.W. by putting the "skirt and underwear" back on R.W.'s body.[40] The appellant told LCpl Gardner that he deleted a photograph of R.W. from his phone, both establishing that the appellant indeed took a photograph of R.W.; and suggesting, by the appellant's consciousness of his own guilt, that this photograph was illicit.[41]. We thus find the evidence both legally and factually sufficient to sustain this conviction.

*3. Fraternization*

Finally, the appellant contends that "the Government failed to prove that [his] particular relationship with a LCpl, who was not in his unit, violated the custom of the Naval Service and was prejudicial to good order and discipline."[42] We agree.

Additional Charge III, Specification 2 alleged a violation of Article 134, UCMJ:

> In that [the appellant] did . . . knowingly fraternize with [LCpl] Zeyquan M. Gardner, an enlisted person, on terms of military equality, to wit: interacting with [LCpl] Zeyquan M. Gardner in an unduly familiar manner, in violation of the custom of the Naval Service of the United States that noncommissioned officers shall not fraternize with enlisted persons on terms of military equality, such conduct being prejudicial to good order and discipline in the armed forces.

Charge Sheet. The elements of this offense are: (1) that the appellant was a noncommissioned or warrant officer; (2) that the appellant fraternized on terms of military equality with LCpl Gardner in a certain manner; (3) that the appellant knew LCpl Gardner to be an enlisted member; (4) that such fraternization violated the custom of the appellant's service that noncommissioned officers shall not fraternize with enlisted members on terms of military equality; and (5) that, under the circumstances, the conduct of the appellant was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. MCM, Part IV, ¶ 83b.

---

[40] *Id.*

[41] *United States v. Moran*, 65 M.J. 178, 188 (C.A.A.F. 2007) ("That an inference of consciousness of guilt can be drawn from the destruction of evidence is well-recognized in the law.") (citations and internal quotation marks omitted).

[42] Appellant's Brief at 9.

The explanation section of this paragraph explains:

> Regulations, directives, and orders may also govern conduct between officer and enlisted personnel on both a service-wide and a local basis. Relationships between enlisted persons of different ranks, or between officers of different ranks may be similarly covered. Violations of such regulations, directions, or orders may be punishable under Article 92[, UCMJ].

MCM, Part IV, ¶ 83c(2).

Instead of alleging a violation of the United States Navy Regulations, Article 1165, as an Article 92, UCMJ, offense, the prosecution here chose to charge the appellant with fraternization under Article 134, UCMJ. The government relies on *United States v. Carter*, 23 M.J. 683, 685 (N.M.C.M.R. 1986), for its argument that "the United States did not have to satisfy the first element for fraternization where the offense alleged is one between two enlisted personnel."[43]

*Carter* was decided shortly after fraternization by an officer with an enlisted person was first proscribed within Part IV of the MCM, in 1984. While the enumerated Article 134 offense for officer to enlisted fraternization was new to the 1984 MCM, its analysis section made clear that the offense itself—"based on longstanding custom of the services," including that "[r]elationships between . . . noncommissioned or petty officers and their subordinates may, under some circumstances, be prejudicial to good order and discipline"—was not, and that the new "paragraph [was] not intended to preclude prosecution for such offenses." MCM (1984 ed.), App. 21, ¶ 83.

*Carter's* narrow holding, that senior enlisted service members could be convicted of fraternizing on terms of military equality with junior enlisted service members who were under their direct supervision—under the specific circumstances alleged and proven in that case—does not apply here. The Article 134, UCMJ, specification in *Carter* alleged that, as a Boatswain's Mate Senior Chief on board a ship, Carter "knowingly and wrongfully fraternize[d] with [a] Boatswain's Mate Seaman" within his division, for whom Carter "was [the] division officer" by "dating and engaging in sexual relations, in violation of the custom of the Naval Service of the United States that division officers shall not fraternize with subordinates in the division on terms of military equality." 23 M.J. at 685. The court found this specification provided sufficient notice to overcome the vagueness challenge, and affirmed the conviction given the "unrebutted testimony at trial of several senior enlisted personnel [which] established the existence of a Naval customary

---

[43] Government's Brief of 27 Apr 2016 at 30, n.9.

prohibition against sexual relationships between division officers, without regard to rank, and their subordinates," and "a command instruction forbidding fraternization in any form." *Id.*

The specification in this case simply replaced the word "commissioned" or "warrant" with "noncommissioned," and left the otherwise officer specific language unaltered. The resulting allegation—described as the fourth element in the findings instructions that the military judge provided to the members—is "that noncommissioned officers shall not fraternize with enlisted members on terms of military equality," under Marine Corps customs.[44] As all noncommissioned officers are themselves enlisted members, this allegation does not provide the appellant with sufficient notice of an actual UCMJ violation, and thus fails to state an offense. Consequently, we set aside the fraternization conviction.

## B. Sentence severity

The appellant contends his sentence is inappropriately severe considering LCpl Gardner's adjudged confinement, and that we should affirm no more than 24 months' confinement here.

We review sentence appropriateness *de novo. United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). When arguing for relief based on sentence disparity in the exercise of our unique, highly discretionary authority to determine sentence appropriateness under Article 66, UCMJ, the appellant must demonstrate "that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.' If the appellant meets that burden . . . then the Government must show that there is a rational basis for the disparity." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999). "Closely related" cases involve "offenses that are similar in both nature and seriousness or which arise from a common scheme or design." *United States v. Kelly*, 40 M.J. 558, 570 (N.M.C.M.R. 1994)*; see also Lacy*, 50 M.J. at 288. However, co-conspirators are not entitled to equal sentences. *United States v. Durant*, 55 M.J. 258, 260, 263 (C.A.A.F. 2001) (finding no abuse of discretion in "highly disparate" sentences for co-conspirators); *see also United States v. Wacha*, 55 M.J. 266, 268 (C.A.A.F. 2001) (affirming the lower court which concluded that the fact Wacha's co-conspirator received less punishment did not render the Wacha's sentence a miscarriage of justice). In assessing whether sentences are highly disparate, we are "not limited to a narrow comparison of the relative numerical values of the sentences at issue," but may also consider "the disparity in relation to the potential maximum punishment." *Lacy*, 50 M.J. at 289.

---

[44] Record at 508.

We find that the appellant has not demonstrated that his sentence is highly disparate with LCpl Gardner's adjudged sentence. The appellant faced a maximum punishment of 40 years' confinement. His three years of adjudged confinement was only 10 months more than LCpl Gardner's. This is well within the range of appropriate outcomes at different courts-martial. *See Lacy*, 50 M.J. at 289 (holding that eighteen, fifteen, and eight month confinement sentences were not highly disparate given "the maximum confinement of 27 years that the appellant was facing.").

Even if, as the appellant suggests, the sentences were highly disparate, we find a rational basis for any sentence disparity. The appellant pleaded not guilty and elected trial by officer and enlisted members. LCpl Gardner testified as a government witness against the appellant before pleading guilty at his own court-martial pursuant to a negotiated pretrial agreement. Further, the appellant was more culpable based on his superior rank as a noncommissioned officer, and he largely controlled the circumstances that unfolded with H.I. and R.W.—by driving while searching for alcohol, allowing them to consume alcohol, thwarting Cpl Handoo's chances at a potential evening with H.I., offering Cpl Handoo an opportunity to have sex with R.W. after the appellant already had sex with her and she vomited, allowing LCpl Gardner to have sex with R.W. when Cpl Handoo declined and left the hotel, and encouraging LCpl Gardner to "just [not] kiss her in the mouth." The circumstances related to the respective misconduct and separate trials are sufficiently different to explain and justify the different sentences.

**C. Sentence reassessment**

Having determined that sentencing relief is not appropriate for the reason raised in the appellant's sentence severity AOE, we now consider sentence reassessment in light of our setting aside the fraternization conviction. Courts of Criminal Appeals (CCAs) can often "modify sentences 'more expeditiously, more intelligently, and more fairly' than a new court-martial[.]" *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013) (quoting *Jackson v. Taylor*, 353 U.S. 569, 580 (1957)). In such cases, CCAs "act with broad discretion when reassessing sentences." *Id.* We consider the following "illustrative, but not dispositive, points of analysis . . . when determining whether to reassess a sentence or order a rehearing" in this case:

(1) Whether there has been a dramatic change in the penalty landscape or exposure.

(2) Whether sentencing was by members or a military judge alone.

(3) Whether the nature of the remaining offenses captures the gravamen of criminal conduct included within the original offenses and whether significant or aggravating circumstances addressed

at the court-martial remain admissible and relevant to the remaining offenses.

(4) Whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.

*Winckelmann*, 73 M.J. at 15-16. Reassessing a sentence is appropriate only if we are able to reliably determine that, absent the error, the sentence would have been at least of a certain magnitude. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000). A reassessed sentence must not only "be purged of prejudicial error [but] also must be 'appropriate' for the offense involved." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

Under all the circumstances presented, we find that we can reassess the sentence, and it is appropriate for us to do so. First, the penalty landscape has not changed dramatically. The maximum punishment for fraternization is two years' confinement and a dishonorable discharge. Setting aside the fraternization conviction only reduces the appellant's maximum punishment from 40 to 38 years. Next, while the appellant was sentenced by members, and we are less likely to be certain of what sentence members, as opposed to a military judge, would have imposed, we have extensive experience and familiarity with the remaining offenses, as none presents a novel issue in aggravation. Finally, the remaining offenses capture the gravamen of the criminal conduct at issue, and all the evidence remains admissible.

Taking these facts as a whole, we can confidently and reliably determine that, absent the error, the members would have sentenced the appellant to at least confinement for 3 years, reduction to pay grade E-1, and a bad-conduct discharge. We also find that sentence to be an appropriate punishment for the modified convictions and this offender—thus satisfying the requirement for a reassessed sentence both purged of error and appropriate. *Sales*, 22 M.J. at 308.

### III. CONCLUSION

The guilty finding for Specification 2 under Additional Charge III—fraternization—is set aside and that specification is dismissed. The remaining findings and sentence, as approved by the convening authority, are affirmed.

Chief Judge GLASER-ALLEN and Judge HUTCHISON concur.

For the Court

R.H. TROIDL
Clerk of Court



15